UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TERESA RHOADES and MICHAEL ALLEN RHOADES, individually and as parents and next friends of CHELSEA RHOADES, a minor, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )   3:05 CV 586 |
| PENN-HARRIS-MADISON SCHOOL CORPORATION, an Indiana Political Subdivision, *et al.*, | )<br>)<br>)<br>) |
| Defendants. | ) |

## OPINION and ORDER

This matter is before the court on defendant Madison Center, Inc.'s motion to dismiss plaintiffs' amended complaint (DE # 16, hereinafter, "Complaint") for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). Madison Center argues that plaintiffs' complaint alleges medical malpractice claims. Under Indiana's Medical Malpractice Act, with exceptions not applicable here, before a plaintiff can bring a medical malpractice action in court, the claim must be pursued administratively by presenting it to a medical review panel. *See* Ind. Code § 34-18-8-4. Plaintiffs in this case have not done so, and Madison Center argues that the complaint must therefore be dismissed. *See Jones v. Griffith*, 870 F.2d 1363, 1368 (7th Cir. 1989) (Until plaintiff "can file suit there can be no federal jurisdiction. The proceeding before the panel, together with any ancillary proceeding in an Indiana state court to instruct the panel, is under Indiana law a condition precedent to the maintenance of a lawsuit."). Plaintiffs'

response, stated in oversimplified terms, is that the complaint does not plead claims for medical malpractice, and that plaintiffs do not have to exhaust state-law administrative remedies before pursuing a claim for a violation of a right guaranteed by federal law.

To analyze the arguments in more detail, the allegations of the complaint must be summarized. The plaintiffs are Teresa Rhoades and Michael Allen Rhoades, suing in their own names and as the parents and next best friends of their daughter, plaintiff Chelsea Rhoades.[1] The complaint alleges that Chelsea, an unemancipated minor at all relevant times, was in the tenth grade at Penn High School on December 7, 2004, at which time she was given a "TeenScreen" mental health evaluation. The evaluation was conducted by defendant Madison Center, a non-profit corporation operating a community mental health center, acting as the agent of defendant Penn-Harris-Madison School Corporation (hereinafter, "the school"). After the evaluation, which consisted of Chelsea answering a series of "yes-no" questions she viewed on a computer monitor, a representative of Madison Center informed Chelsea that she suffered from two mental health problems: obsessive-compulsive disorder, and social anxiety disorder.

Approximately two months prior to the administration of the "TeenScreen" evaluation, a letter dated October 1, 2004 had been prepared and signed by several school administrators (all of whom are named as defendants), advising parents that the evaluation would be performed unless they "opted out" by returning an attached form

---

[1] Hereinafter, the court will use "plaintiffs" to refer to all three plaintiffs, "the Rhoades" to refer jointly to parents Teresa and Michael Allen, and "Chelsea" to refer individually to their daughter.

2

indicating that they did not want their child evaluated. The letter was addressed "Dear Parents" generally rather than to specific individuals. Plaintiffs do not allege in the complaint whether the letter was mailed or sent home with Chelsea, but they do allege that the Rhoades never received it. Plaintiffs allege that using this procedure, that is, giving Chelsea the evaluation by default option instead of obtaining the Rhoades' affirmative written prior consent to the evaluation, violated both federal and state law. Among other provisions, plaintiffs point to 20 U.S.C. § 1232h(b), which provides in pertinent part:

> No student shall be required, as part of any applicable program, to submit to a survey, analysis, or evaluation that reveals information concerning . . . (2) mental or psychological problems of the student or the student's family . . . in the case of an unemancipated minor, without the prior written consent of the parent.

Plaintiffs' allege that the violation of this federal statute, and a similar Indiana statute, gives rise to seven claims.

Specifically, the Rhoades allege in count 1 of the complaint (which begins at Roman IV) that they have a fundamental liberty interest under the Fourteenth Amendment to the United States Constitution in the care and upbringing of Chelsea, which defendants' actions violated, for which they are entitled to damages under 42 U.S.C. § 1983.

In Count 2 (beginning at Roman numeral V), plaintiffs allege that they have a fundamental liberty interest under the Fourteenth Amendment to the United States

3

Constitution to privacy, which defendants' actions violated, for which plaintiffs are entitled to damages under 42 U.S.C. § 1983.

In Count 3 (beginning at Roman VI), plaintiffs allege that defendants actions violated an Indiana statutory provision requiring the Rhoades' affirmative consent to an evaluation of Chelsea, Ind. Code § 20-10.1-4-15(b),[2] entitling all three plaintiffs to damages.

In Count 4 (at Roman VII), plaintiffs allege that defendants negligently breached duties of care owed to plaintiffs not to evaluate Chelsea without first obtaining the Rhoades' affirmative consent, not to communicate a diagnosis to Chelsea, and to use due care in communicating any diagnosis, and violated a duty of care in communicating the diagnosis/results of the evaluation to Chelsea, which entitles plaintiffs to damages.

In Count 5 (at Roman VIII), plaintiffs allege that they are entitled to damages because defendants violated their right to privacy by "extracting from Chelsea highly personal and private information about Chelsea and her family and using that information for the purpose of conveying a fallacious and highly damaging diagnosis of Chelsea's mental condition." Complaint ¶ 8.2.

In Count 6 (at Roman IX), plaintiffs seek damages under a state-law tort theory, intentional infliction of emotional distress, committed by defendants' "relating to

---

[2] This section of the Indiana code was repealed effective July 1, 2005, but a substantially identical provision is now at Ind. Code § 20-30-5-17(b).

4

Plaintiff Chelsea Rhoades a diagnosis that she suffered from obsessive compulsive disorder and social anxiety disorder" [sic]. Complaint ¶ 9.2.

Finally, in Count 7 (at Roman X), plaintiffs seek damages for a violation of a privacy right under the Indiana constitution by the defendants' "by subjecting Chelsea to the 'TeenScreen' examination without the valid consent of any of the Plaintiffs, by extracting highly personal and private matters from Chelsea, and by using such information to make and convey a fallacious diagnosis of Chelsea's mental and psychological condition." Complaint at ¶ 10.4.[3]

As an initial matter, in its reply to plaintiffs' argument that they need not exhaust state-law remedies before pursuing federal claims, Madison Center "concedes that plaintiffs' claims based on federal question jurisdiction are not subject to the provisions of the Indiana Medical Malpractice Act. Plaintiffs' only federal question jurisdiction claims, however, involve their first two claims." Madison Center, Inc.'s Reply to Plaintiffs' Response to Motion to Dismiss (DE # 13, hereinafter "Reply") at 8. The court therefore need only consider whether or not counts 3-7 of plaintiffs' complaint allege medical malpractice claims which must be dismissed. Before addressing the parties' arguments on this issue as to these counts, the court makes a general observation.

---

[3] The court notes that, on the face of the complaint, it is difficult to see how this differs from the privacy right alleged to have been breached in Count 5, the source of which is not specified. In their response, however, plaintiffs assert that Count 5 relies on a right of privacy found in Indiana common law.

The premise of Madison Center's motion to dismiss counts 3-7 is that "the allegations of plaintiffs' complaint establish that the claims against Madison Center are based on a claim of medical negligence." Memorandum in Support at 4. According to Madison Center, this is because paragraph 3.1 and 3.22 of the complaint, which are incorporated thereafter into every claim, state in relevant part:

> The incidents and claims in this action arise out of the administration and implementation of a program known as "TeenScreen." "TeenScreen" was developed and is supported and promoted by Columbia University in New York, New York. The stated goal of the "TeenScreen" program is to "make voluntary mental health checkups available for all American teens." . . . "TeenScreen" has been promoted as a tool for screening children for mental health problems, particularly depression, and as a suicide-prevention tool.
> . . .
> The diagnosis [communicated to Chelsea] was erroneous, improper, and done with reckless disregard for the welfare of Chelsea.

Complaint ¶¶ 3.1, 3.22.

Under Indiana law, courts "have historically determined the applicability of the [Medical Malpractice] Act by examining whether the cause of action alleged sounds in medical malpractice or in ordinary negligence." *Winona Memorial Hosp., Ltd. Partnership v. Kuester*, 737 N.E.2d 824, 827 (Ind. Ct. App. 2000). In making this determination, the court should be "guided by the substance of the claim as pleaded." *Id.* The statute defines "malpractice" as a "tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a

6

health care provider, to a patient," Ind. Code § 34-18-2-18, and thus a patient-physician relationship must exist in order for the Medical Malpractice Act to apply. *Weldon v. Universal Reagents, Inc.*, 714 N.E.2d 1104, 1110 (Ind. Ct. App. 1999). Whether a physician-patient relationship exists is a question of law for the court to decide. *Dixon v. Siwy*, 661 N.E. 2d 600, 607 (Ind. Ct. App. 1996).

In *Weldon*, the plaintiff had chosen to participate, for monetary compensation, in a red blood cell donor program, and as part of that participation signed a written consent to being injected with human red blood cell antigens. *Id*. at 1106. Medical complications ensued and plaintiff, over defendant's objections, quit the program. Eventually, she brought suit[4] against defendant alleging battery, for not informing her that the antigens would permanently change her blood, and intentional infliction of emotional distress, for resisting her leaving the program. The trial court held that it lacked subject matter jurisdiction to hear the claims because they had not been submitted to a medical review panel as required by the Medical Malpractice Act. Reversing, the court of appeals found that no physician-patient relationship existed, primarily[5] because of an absence of evidence that the plaintiff "suffered from any

---

[4] The court has simplified a number of procedural details, among them, that plaintiff's claims were raised as counterclaims after she was sued for breach of contract for leaving the program.

[5] The court of appeals also noted that the medical procedure was not for the plaintiff's benefit. This is a distinction from the present case, where it can be assumed for now that the procedure was intended to benefit Chelsea.

7

medical condition or that she went to [defendant] URI in search of medical treatment or care." *Id*. at 1109-1110.

In the present case, although every claim may arise from the implementation of a mental health screening procedure, neither Chelsea, nor her parents on her behalf, sought that treatment out. One way to characterize the crux of some, if not all, of the claims alleged in the complaint, is that no physician-patient relationship ever arose because the consent necessary to establish that relationship was never obtained from the Rhoades.[6] Moreover, although every claim pleaded does include the allegation that it arises from the "TeenScreen" program, the fact that the program resulted in a medical diagnosis appears completely irrelevant to some of the claims. For example, plaintiffs' third claim is that Madison Center violated a statutory requirement to obtain the Rhoades' consent before subjecting Chelsea to any survey, evaluation or analysis that might reveal personal and private information. That survey or evaluation need not be medical in nature, and the presence, or absence, of malpractice is irrelevant: as a hypothetical, even if the TeenScreen had identified Chelsea as an imminent suicide risk and saved her life, plaintiffs' claim would be the same.

Thus, the court starts its analysis with an initial reluctance to conclude that every claim in the complaint is a claim for medical malpractice, simply because the TeenScreen program is involved. The court believes that this reluctance is consistent

---

[6] The issue of the nature of the consent necessary to establish a physician-patient relationship is discussed at some length later in this memorandum.

with the admonition that "[s]tatutory procedures for bringing a medical malpractice action are in derogation of common law, and as such, they are to be strictly construed against limiting a claimant's right to bring suit." *Weldon*, 714 N.E.2d at 1107-08 (citing *Comer v. Gohil*, 664 N.E.2d 389, 391 (Ind. Ct. App. 1996).

In response to the blanket assertion that every claim in their complaint is one for medical malpractice, plaintiffs respond first that the Medical Malpractice Act by its express terms applies solely to claims "for bodily injury or death on account of malpractice," Ind. Code § 34-18-8-1, and that they are seeking damages for emotional distress only, not bodily injuries. They compare their claims to those in *Peters v. Cummins Mental Health, Inc.*, 790 N.E.2d 572 (Ind. Ct. App. 2003).

In *Peters* the plaintiff was the mother of a twelve-year-old son for whom a psychological assessment was conducted by the defendant, a mental health provider. The assessment include a statement that the plaintiff had been "declared an unfit mother," and she brought suit alleging that the defendant's statement was defamatory and had caused her extreme emotional distress. Defendant argued that because the statement was part of a mental health assessment of her son, her claim was for medical malpractice and had to be submitted to a medical review panel. The court of appeals held that the plaintiff was not asserting a claim for bodily injury or death on account of medical malpractice, that no physician-patient relationship existed between the plaintiff and the defendant because it had not performed any medical services for her benefit, and that she was not a patient by virtue of making a derivative claim—such as loss of

9

her child's services—because of malpractice. Instead, because she was alleging that she personally had suffered emotional distress by being labeled an unfit mother, her claim was outside the purview of the Medical Malpractice Act. *Id*. at 577.

In its reply memorandum, Madison Center argues that plaintiffs are mistaken that the Medical Malpractice Act applies only to bodily injury.[7] Madison Center advances this proposition based on *Keim v. Potter*, 783 N.E. 2d 731 (Ind. Ct. App. 2003), a case involving Indiana's "modified impact" rule for negligent infliction of emotional distress, which requires "direct involvement" in the underlying tort before emotional distress damages can be recovered. In *Keim* the plaintiff by mistake had been told that he suffered from hepatitis. The court held that his direct involvement in the underlying malpractice tort—the mistaken diagnosis—satisfied the impact requirement, rejecting the argument that such direct involvement was adequate only for bystanders. *Id*. at 735. In a footnote the court stated:

> Keim also contends, in the alternative, that the impact rule should not apply to medical malpractice victims seeking emotional damages. But we need not go that far. Instead, we have determined that patients who bring medical malpractice claims satisfy the requirements of the modified impact rule.

---

[7] Madison Center also argue that plaintiffs are in fact alleging bodily injury: because plaintiffs seek emotional distress damages in addition to damages for "pain and suffering," the pain and suffering must mean from an actual bodily injury. Cases from numerous jurisdictions recognize, however, that severe emotional distress can have physical manifestations such as gastric distress, sleeplessness, exhaustion, etc., *see Schimizzi v. Illinois Farmers Ins. Co.*, 928 F. Supp. 760, 777-82 (N.D. Ind. 1996) (reviewing cases), which could cause physical pain and suffering. Thus, the complaint does not necessarily allege a bodily injury.

10

Id. at 735 n. 4. Thus, Madison Center asserts that "the Indiana Court of Appeals has implicitly, if not explicitly, acknowledged that the Medical Malpractice Act covers emotional distress-type damages and not solely bodily injuries." Reply Memorandum at 3.

This is not necessarily true. Besides being dicta, the court's comment does not necessarily mean that a medical malpractice victim claim limited to emotional distress damages satisfies the statutory requirement, under the Medical Malpractice Act, of a bodily injury. More importantly, because the impact rule applies only to negligent infliction of emotional distress, *Keim* has no application to claims such as the Rhoades' third, which alleges that Madison Center intentionally violated a statutory requirement. Complaint ¶ 6.3. See *Cullison v. Medley*, 570 N.E.2d 27 (Ind. 1991) (for intentional torts, recovery for emotional distress allowed in the absence of any physical injury if the tort is one which would foreseeably provoke an emotional disturbance of the kind normally aroused in the mind of a reasonable person).

Thus, the court believes that count 3 of the complaint, which alleges that the Rhoades, and Chelsea, suffered emotional distress damages because of the intentional violation of a statutory requirement to obtain the Rhoades' consent before administering any evaluation to Chelsea that might reveal private and personal information does not require a showing of medical negligence to recover, and so is not

11

a medical malpractice claim subject to dismissal.[8] *Cf. Smith v. Methodist Hosp. of Indiana, Inc.*, 569 N.E.2d 743, 746 (Ind. Ct. App. 1991) ("[The] Smiths' complaint is based upon *the existence of a duty Methodist owed them, independent of the duty Methodist owed Richard, to advise them, as Richard's parents, of Richard's condition* including the physicians' opinion Richard was brain dead[.]") (emphasis added).[9] As in *Peters*, the Rhoades claim is not for damages on account of medical malpractice, but on account of an alleged injury existing independently of any malpractice, the claimed breach of a parental interest in making important decisions with respect to Chelsea's upbringing and education, and Chelsea's interest in having those decisions made by her parents. The same is true for counts 5[10] and 7, which allege invasions of privacy under Indiana law. All of these claims, even to the extent they seek damages for Chelsea herself, assert a

---

[8] The court expresses no opinion at the present time as to whether the relevant sections of the Indiana code provide a private civil action for damages.

[9] The next sentence in *Smith* is: "Therefore, we are not concerned with an injury allegedly arising from lack of consent to a course of medical treatment.") As this court reads *Smith*, that comment only means that the Smiths were not alleging an injury caused by defendant's failure to communicate the information they needed to give informed consent for their son's medical care: "We hold Methodist did not owe a duty to Smiths to advise them of Richard's condition where that information was not related to a course of medical treatment." *Smith*, 569 N.E.2d at 746. In the present case plaintiffs are not complaining of an injury, medical malpractice, arising from lack of consent. Instead, they are complaining that, independent of any duty of due medical care to obtain informed consent, statutory and common-law duties with respect to their parental rights were breached.

[10] Although count 5 alleges that a false and harmful diagnosis was conveyed to Chelsea, the crux of the allegation is an invasion of privacy that is not dependent on the diagnosis having been conveyed.

12

wrong that does not depend on a showing of improper medical treatment, but instead on the breach of a duty not to interfere in the privacy of the familial relationship between Chelsea and her parents.[11]

On the other hand, the court is not able to conclude with a comfortable degree of certainty that count 4, alleging in part a breach of a duty of due care in communicating a diagnosis to Chelsea, and count 6, alleging intentional infliction of emotional distress caused by relating a diagnosis to Chelsea, arise independently of an allegation of medical negligence, given that plaintiffs do specifically base these claims on an allegation that the diagnosis was erroneous and improper. Thus, in the absence of an Indiana case specifically determining whether or not claims limited solely to emotional distress arising from medical malpractice are sufficient to meet the statutory requirement of a bodily injury, Ind. Code § 34-18-8-1, it would be preferable if a decision could be made as to counts 4 and 6 for another reason. The court therefore turns to plaintiffs' alternative argument why the counts are not medical malpractice claims.

---

[11] At this stage, where plaintiffs must be given the benefit of every hypothesis consistent with the allegations of their complaint, the court is concerned solely with Madison Center's argument that the complaint is based on medical malpractice. The court expresses no opinion on the scope, or existence, of the various liberty and privacy interests claimed by plaintiffs.

Plaintiffs' second argument,[12] already alluded to above in the court's general observation, is that none of their claims are medical malpractice claims because no physician-patient relationship existed. They argue that a physician-patient relationship arises by virtue of the consensual contract entered into between the patient and the physician for medical care, and in the present case there could be no such contract because Chelsea, an unemancipated minor, could not give consent, and the Rhoades did not consent. Plaintiffs' Response at 5-6.

Madison Center's argument in reply is that the contract need not be formed by the patient him/herself. As long as a contract for medical services does exist, then there is a physician-patient relationship. Madison Center relies heavily on *Gooley v. Moss*, 398 N.E.2d 1314 (Ind. Ct. App. 1979) and *Walters v. Rinker*, 520 N.E.2d 468 (Ind. Ct. App. 1988). Madison Center quotes the latter case as follows:

> While Dr. Walters contends that the relationship between himself and Rinker was a non-consensual one because Rinker did not personally seek Dr. Walters' assistance, at least three Indiana cases support the conclusion that a consensual relationship between a physician and a patient may exist where others have contracted with the physician on the patient's behalf. See *Scruby v. Waugh* (1985), Ind. Ct. App., 476 N.E. 2d 533 (physician-patient relationship existed for the purposes of medical malpractice action where estranged wife contracted with physician who signed

---

[12] Plaintiffs make a third argument, in somewhat cursory terms, that the complaint does not allege that Madison Center's acts occurred during "medical care, treatment or confinement," which is the definition of health care for the purpose of the statute. Ind. Code § 34-18-2-13. However, ¶ 3.1 of the complaint alleges that the TeenScreen is promoted as "a tool for screening children for mental health problems." This would constitute medical care or treatment within the meaning of the Act.

14

>commitment papers); *Detterline v. Bonaventura* (1984), Ind. Ct. App., 465 N.E.2d 215 (physician-patient relationship existed for purposes of malpractice action where wife contracted with physician who signed commitment papers); *Gooley v. Moss* (1979), Ind. Ct. App., 398 N.E.2d 1314 (physician-patient relationship existed for purposes of medical malpractice action where county department of public welfare contracted with physician to perform surgery upon a ward of the department). . . . The important fact in determining whether the relationship is a consensual one, however, is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for his benefit.

*Walters*, 520 N.E. 2d at 472.

Madison Center concludes: "Read together, these cases establish that as long as there is a contract to provide medical services for the benefit of a person, that person is a 'patient' pursuant to the Indiana Medical Malpractice Act, even if the party contracting with the health care provider on behalf of the patient is unauthorized to do so." Reply brief at 7. Madison Center arrives at this conclusion because in *Gooley v. Moss* the court found that the party entering into the contract on the patient's behalf, the Marion County, Indiana, Department of Public Welfare, did not have the power to consent to the patient's sterilization. *Gooley*, 398 N.E.2d at 1320.

The court is not sure that the cases summarized by *Walters* go as far as Madison Center believes. In *Gooley* the plaintiff had been a ward of the county by a juvenile court: "Stanton, as director of the Marion County Department of Public Welfare, had authority to consent to Cathy Gooley's medical or surgical treatment." *Gooley*, 398 N.E.2d at 1319. *Scruby* and *Detterline* both involved spousal consent to medical

treatment. Court-appointed guardians of minors, and spouses, do have the authority to make medical decisions, respectively, for their wards and marital partners. Ind. Code § 16-36-1-5.[13] "In other words, the relevant cases all involve contracts made by parties with authority in some circumstances to act on the purported patient's behalf,[14] while plaintiffs' theory in the present case may[15] be that the school had no such authority.

In addition, *Walters'* attempt to explain *Gooley* on the basis that it involved a contract "for the patient's benefit," *Walters*, 520 N.E.2d at 472, is somewhat strained. The holding in *Gooley* was based on the fact that a contract for medical services existed, even though Marion County could not consent to sterilization because that procedure did not constitute "medical or surgical services for the purpose of diagnosing some ailment or effecting a cure of some injury or disease." *Gooley*, 398 N.E.2d at 1319. Thus, it is

---

[13] A similar version of this provision was in effect prior to 1993 as Ind. Code § 16-8-12-4.

[14] *Walters*, the case summarizing the others, involved however a pathologist arguing that no physician-patient relationship existed between him and the plaintiff. The court acknowledged that "[n]o Indiana cases have been located which directly hold that a consensual physician-patient relationship exists where a family doctor contracts with a pathologist to diagnose a tumor removed from the patient's body." 520 N.E.2d at 472. The court found that the relationship did exist because plaintiff's treating physician had contracted with the pathologist for plaintiff's benefit. Patient's expect that their treating physicians will utilize other medical specialists, such as laboratories. Thus, it is not difficult to conclude that *Walters* could be explained on the basis of implied consent to the contract.

[15] The court uses "may," because alleging that parental consent was necessary is not the same as alleging that the school in no circumstances had authority to contract for medical care for Chelsea.

16

difficult to see how the contract formed was for Gooley's benefit. Instead, the case seems to hinge on the mere fact that a contract existed.

Nevertheless, this court must base its decision whether counts 4 and 6 are medical malpractice claims on a prediction of how the Indiana Supreme Court would decide the issue. *Commonwealth Ins. Co. v. Stone Container Corp.*, 323 F.3d 507, 509 (7th Cir. 2003). In arriving at that determination, this court should follow the holdings of the intermediate appellate courts unless there is a persuasive reason to believe that the Indiana Supreme Court would take a different path. *Id*.

Plaintiffs have not persuaded the court that the rule from *Walters* would not be followed to decide whether a consensual physician-patient relationship exists: the "important fact in determining whether the relationship is a consensual one, however, is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for his benefit." *Walters*, 520 N.E. 2d at 472. Given that plaintiffs allege in the complaint that the TeenScreen was promoted to the school "as a tool for screening children for mental health problems, particularly depression, and as a suicide prevention tool," Complaint ¶ 3.1, that Madison Center acted as the school's agent for the purpose of administering the test, Complaint ¶ 3.16, and that counts 4 and 6 allege liability based on an erroneous and improper diagnosis made by Madison Center—plainly the type of exercise of medical judgment and skill to which Indiana's Medical Malpractice Act was intended to apply, *cf. St. Mary Medical Center*,

17

*Inc. v. Casko*, 639 N.E.2d 312, 315 (Ind. Ct. App. 1994)—the court finds that counts 4 and 6 are for medical malpractice and should be dismissed.

Finally, plaintiffs argue that rather than dismissing the counts, the court should sever them. RULE 21 of the FEDERAL RULES OF CIVIL PROCEDURE allows a court to sever claims for separate proceedings. Madison Center argues that is inappropriate here, because the court cannot proceed on counts 4 and 6 as it lacks subject-matter jurisdiction over those claims until they are presented to a medical review panel. The court agrees and counts 4 and 6 will be dismissed.

For the foregoing reasons, defendant Madison Center's motion to dismiss (DE # 23–incorporating DE# 8) is **GRANTED IN PART and DENIED IN PART**. Counts 4 and 6 are hereby **DISMISSED** as to defendant Madison Center only. The parties are directed to immediately request a status conference before Magistrate Judge Nuechterlein to finalize a discovery and briefing schedule on the pending motion for summary judgment.

                                          **SO ORDERED.**

Enter: September 26, 2006

                                          s/James T. Moody
                                          JUDGE JAMES T. MOODY
                                          UNITED STATES DISTRICT COURT