### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| TERESA RHOADES and MICHAEL ALLEN RHOADES, individually and as parents and next friends of CHELSEA RHOADES, a minor, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 3:05 CV 586 |
| PENN-HARRIS-MADISON SCHOOL CORPORATION, an Indiana Political Subdivision, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

### OPINION and ORDER

This matter is before the court on a motion for summary judgment filed by defendants Penn-Harris-Madison School Corporation ("PHMSC") and five individuals employed by PHMSC at Penn High School: school principal David R. Tydgat; associate principals Dave Risner and Steven Hope; and guidance counselors Marni Cronk and Vickie Marshall. The complaint names these individuals in both their official and individual capacities, and the motion for summary judgment addresses both. For convenience, and because official-capacity claims really are claims against the employing governmental entity, *Guzman v. Sheahan*, 495 F.3d 852, 859 (7th Cir. 2007), references to PHMSC or "the school defendants" should be understood to include both PHMSC and the individual defendants in the official capacities. When the court addresses claims made against the individual defendants in their individual capacities, it will use either their names or the collective reference "the individual defendants."

The plaintiffs are Chelsea Rhoades,[1] who at the time of the incident involved in this suit was a 15-year-old sophomore at Penn High School, and her parents, Teresa and Michael Allen Rhoades, individually and as Chelsea's parents and next friends. In the complaint they filed initiating this action, plaintiffs claimed that a number of their state and federal constititutional and statutory rights were violated when a "TeenScreen" psychological assessment[2] of Chelsea (and other students) was conducted at school without first obtaining Teresa and Michael Rhoades' written consent.

**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

---

[1] In some filings the parties have identified Chelsea by her initials only. In other public filings, including the amended complaint, her full name has been used. Therefore, the court sees no reason not to identify her by name herein.

[2] In this opinion and order, the court will refer to the TeenScreen using various terms such as assessment, survey and exam. These references are not intended to place the TeenScreen in any particular category. The parties generally refer to the TeenScreen as a suicide-prevention screening test developed at Columbia University. *See* www.teenscreen.org.

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. PROC. 56(c)). When considering a motion for summary judgment, the court must view the record and all reasonable inferences in a light most favorable to the nonmovant. *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. In short, if the court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the court should enter summary judgment.

**FACTUAL OVERVIEW**

A brief summary of the dispute as gleaned from the plaintiffs' amended complaint and the parties' memoranda supporting and opposing summary judgment provides context for the discussion that follows. Although this summary is largely based on facts that are undisputed, it nevertheless should *not* be taken as a statement of undisputed facts.[3] In the analysis and ruling that follows, the court will refer to material facts as necessary that are either undisputed or, if in dispute, taken to exist in th version most favorable to the Rhoades, the non-movants.

In January 2003 a popular student at Penn High School committed suicide. Community reaction to this tragedy included the forming of a "task force," composed

---

[3] For the purposes of explaining the parties' dispute, the court has included in this overview some facts as PHMSC sees them. In ruling on the motion, however, the court has relied only upon facts which are either not in dispute or which are taken in the version most favorable to the Rhoades.

of leaders in the community in the business, education and health fields, to research

programs and services for the detection and prevention of adolescent suicides. members

of the task force included a former superintendent of PHMSC,[4] and the director of

Madison Center, Inc., a mental healthcare provider also named as a defendant in this

action. Risner Aff.[5] ¶ 3. The task force identified the TeenScreen as a "voluntary mental

health check-up" that could be used as a screening tool to identify adolescents posing a

potential suicide risk. The task force also recommended that a "Yellow Ribbon Suicide

Prevention Program" be implemented. Penn High School followed this

recommendation and integrated the program into its health education curriculum

taught in the tenth grade.

　　While that integration was taking place, the task force asked Penn High School if

it would allow the Madison Center to conduct a "pilot" administration of the

TeenScreen to students at the School in the fall of 2003. The School consented, but

PHMSC maintains that it provided no funding for administration of the test, "merely a

conference room at Penn High School, permission for Madison Center personnel to

come on site to administer the test, and coordination with parents and students who

would be taking the test." Risner Aff. ¶ 7. This assertion is contradicted, however, by

---

[4] It is unclear whether the reference to a "former" superintendent means at the time of the affidavit, or at the time of service on the task force. In other words, the court is not sure whether the person on the task force was, or was not, the superintendent of PHMSC at that time.

[5] The affidavit of assistant principal Risner is DE # 29.

PHMSC's admission that Penn High School staff mailed a letter and consent form for the TeenScreen to students' parents, which is at least a form of indirect funding. Risner Aff. ¶ 7.

Only nine parents returned the form consenting to having their children take the TeenScreen. The task force was disappointed with that result, and proposed to Penn High School that when the test was given in the fall of 2004, a "passive consent" form be used. That meant that a form would be mailed to the parents and if the parents did not return the form to indicate that they did *not* want their children to take the TeenScreen, the TeenScreen would be administered. Penn High School agreed to this passive consent procedure, with an additional requirement, however, that each student sign a form at the time of testing indicating that they were taking the test voluntarily. Risner Aff. at ¶¶ 8-11.

In late October the November issue of the "Kingsman Notes: The Penn High School Newsletter" was mailed to each student's home. The newsletter mentioned that the Madison Center would be administering the TeenScreen to 10th grade students, and attached to the newsletter was a separate letter/opt-out form explaining that the TeenScreen would be administered unless the parents returned the opt-out form by November 8. *Id.* at ¶ 13. Although 23 opt-out forms were returned, *Id.* at ¶ 14. the court believes that a fact finder could conclude that the "Kingsman Notes" would be treated as "junk mail" in many households and quickly thrown out. The Rhoades deny ever

seeing any notice from Penn High School regrading the TeenScreen. Teresa Rhoades Aff. ¶ 9.[6]

The TeenScreen was administered in November and December, 2004. Associate principal/defendant Hope, and guidance counselors/defendants Cronk and Marshall prepared the testing protocol, that is, arranging the schedule for students to be released from class for testing, and requiring that each student sign an "assent form" before taking the TeenScreen. *Id.* at ¶ 15-16. Chelsea was released from class on December 7, 2004, to take the TeenScreen.

Chelsea's version of that day is that her home room teacher, Mrs. Troyer, announced that all students in the room, with one exception, would be going in groups to Conference Room C to take a test. Chelsea Aff. at ¶ 3. Students asked Mrs. Troyer what the test was and she told them she didn't know. *Id.* A memorandum dated November 3, 2004, prepared by guidance counselors/defendants Cronk and Marshall for the home room teachers stated, "[p]lease do not explain what this is to your students. They will receive the letter of explanation in the mail this week." Risner Aff., Ex. M, p. 2.

After Chelsea reported to the conference room, a woman read something about the test while Chelsea was helping a wheelchair-bound friend get situated. Chelsea Aff. at ¶ 4. Then Chelsea signed the assent form, which was laying on the desk. However,

---

[6] This paragraph of Teresa Rhoades' affidavit improperly states her husband's lack of knowledge. PHMSC has not objected, however.

she did not read it, because the woman told her "you need to sign this" and that they all needed to be as quick as possible because many other students needed to take the test. *Id.*; Chelsea Dep. at 37.[7] The woman did not tell Chelsea that the test was voluntary and that she could refuse to take it. Chelsea Aff. at ¶ 4. Chelsea signed the form, thinking it was simply an acknowledgment that she was taking the test. *Id.* Her impression was that she had to sign the form, and that she had to take the test. Chelsea dep. at 38.[8]

After signing the form she was told to sign on to the computer and answer the questions truthfully. *Id.* ¶ 5. Chelsea did so, and after she and the other students completed the test, they were told to wait outside in the hallway. *Id.* After about five minutes a woman came out of the testing room, called Chelsea's name, and walked Chelsea several steps away from the other students. *Id.* ¶ 6. The woman told Chelsea that she had "Obsessive Compulsive Disorder for cleaning and social anxiety disorder," and that she could speak with a counselor, or have her mother call the Madison Center for treatment. *Id.* Chelsea was very "upset and confused" by this information and dwelled on it all day, becoming more upset the more she thought about it. *Id.* ¶ 7. When

---

[7] Selected pages of Chelsea's deposition are attached as Exhibit 4 to the Rhoades' supplemental brief in opposition, DE # 50.

[8] In its reply memorandum PHMSC argues that Chelsea admitted during her deposition that she did read part of the assent form. Reply Memorandum (DE # 60) at 4. The court has been unable to find the deposition pages PHMSC cites anywhere in the record, however. Even assuming that she did admit reading part of the assent form, the court thinks that all of the circumstances indicate there is a question of fact as to whether she understood what she was signing.

7

she arrived at home she asked her mother to explain to her what Obsessive compulsive disorder and social anxiety disorder were. *Id*. ¶ 8.

Although the complaint, as is typical in notice pleading, is somewhat vague as to the exact nature of each statutory and constititutional violation the Rhoades claim resulted from the factual scenario above, PHMSC's motion identifies and addresses a number of "claims"—that is, legal theories[9]—which it believes completely comprise the Rhoades' claim. The plaintiffs have accepted this narrowing by failing to argue, in their response to the motion, that the school defendants left something out. Thus, based on the parties' briefs supporting and opposing summary judgment, the court provides the following outline of the arguments PHMSC makes in support of its motion for summary judgment, as a "roadmap" to the analysis that follows:

I. Liability of defendant PHMSC

    A. Federal substantive due process claims

        1. Liberty interest in upbringing of children

            -Two other circuits have held that "Teen Screen" type tests don't violate substantive due process

---

[9] The parties, using common vernacular, refer to and discuss, for example, "the due process claim" or the "negligence claim," and in this order the court will often lapse into the same terminology. However, to be precise a "claim" is a set of facts that entitles a party to relief, no matter how many legal theories are involved. *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997). Thus, plaintiffs's claim in this case is that the testing caused them compensable injuries. Due process, negligence, etc., are legal theories being used to pursue that claim.

2. Liberty interest in privacy with respect to divulging confidential info

-No violation because TeenScreen was voluntary and confidential

B. State law claims

1. Violation of Indiana Code § 20-10.1-4-15

-Statute doesn't create private right of action
-Testing was voluntary, so statute not violated

2.  Negligent breach of duty giving diagnosis to Chelsea

-No such duty, and no school defendant involved in disclosure

3. Tort invasion of privacy

-No intrusion into physical space, a necessary element

4. Tort intentional infliction of emotional distress

-PHMSC didn't disclose the diagnosis to Chelsea
-Conduct was not extreme or outrageous conduct

5. Indiana Constitutional invasion of privacy
-No material impairment of Rhoades' privacy

II. Liability of individual defendants in their individual capacities

A. Qualified immunity

B. State claims barred by Ind. Code § 34-13-3-5(b)

**ANALYSIS**

*I. Liability of PHMSC*

*A. Federal Claims Based on Substantive due process*

Teresa and Michael Rhoades contend that a violation of their right to substantive due process under the 14th amendment to the United States Constitution occurred when the "TeenScreen" was given to Chelsea without obtaining their prior written consent, depriving them of a liberty interest in directing her upbringing and education, and of a liberty/privacy interest with respect to disclosure of private information.

The substantive due process component of the Fourteenth Amendment "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). But providing a concise description of what a plaintiff must prove to establish a violation of substantive due process under the 14th Amendment is not easy: "courts have long struggled to identify the appropriate analysis for substantive-due-process claims." *Khan v. Gallitano*, 180 F.3d 829, 833 (7th Cir. 1999). Even defining whether the right alleged to have been infringed is protected by substantive due process is difficult:

> [T]he development of this Court's substantive-due-process jurisprudence . . . has been a process whereby the outlines of the "liberty" specially protected by the Fourteenth Amendment—never fully clarified, to be sure, and perhaps not capable of being fully clarified—have at least been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal system. This approach tends to rein in the subjective elements that are necessarily present in due-process judicial review.

*Washington v. Glucksberg*, 521 U.S. 702, 72-22 (1997).

The end result is that an "orderly approach" which attempts to lay out the elements a plaintiff must prove to establish a due process violation is extremely difficult:

> In order to survive summary judgment on a § 1983 claim, Armstrong must present facts to establish that the defendants intentionally or recklessly deprived him of a constitutional right. (Of course, Armstrong must also show that the defendants acted under color of state law and that their actions constituted the legal cause of Armstrong's damages, but the defendants do not appear to contest Armstrong's proof on these elements.) This inquiry involves two separate questions: (1) Did the defendants violate a constitutional right? and (2) Did the defendants act with sufficient culpability?
>
> Unfortunately, this orderly approach deteriorates when the constitutional right exists, if at all, as a matter of substantive due process. Such cases become muddled because any inquiry into substantive due process invokes a " 'less rigid and more fluid' " inquiry than "envisaged in other specific and particular provisions of the Bill of Rights." *County of Sacramento,* 523 U.S. at ----, 118 S.Ct. at 1719[10] (quoting *Betts v. Brady,* 316 U.S. 455, 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942)). In other words, an investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements: "That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in light of other considerations, fall short of such denial." *Id.* (quoting *Betts,* 316 U.S. at 462, 62 S.Ct. 1252).

*Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998).

The court attempts to make something of this muddle, while at the same time trying to limit its analysis to the issues actually raised and presented by the parties'

---

[10] *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998).

arguments for and against summary judgment, rather than issues which the court might like to have seen raised and argued.

*1. Liberty interest in upbringing of children*

Teresa and Michael Rhoades claim that PHMSC deprived them of their liberty interest in directing Chelsea's upbringing and education by administering the TeenScreen exam to her without obtaining their prior written consent. The Supreme Court has recognized for almost 100 years that the due process clause of the Fourteenth Amendment encompasses a liberty interest in the rearing and education of one's children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Carey v. Population Services, Intern.*, 431 U.S. 678 (1977); *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). In its motion for summary judgment, PHMSC does not claim otherwise. Instead, it argues that the right must be balanced with the state's obligation to educate children, and that two circuits have recently "rejected claims under nearly identical circumstances finding that the balance tips in favor of the school to make curricular decisions including the decision to permit surveys like the Teen Screen." Memorandum[11] p. 8.

The cases on which PHMSC relies are *C.N. v. Ridgewood Board of Education*, 430 F.3d 159 (3rd Cir. 2005) and *Fields v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005). PHMSC does an excellent job of summarizing the facts, analysis and holding in

---

[11] All citations to "Memorandum" are to DE # 28.

both cases. Thus, rather than paraphrasing PHMSC's argument, the court quotes it at

length:

> In <u>Fields</u>, a student working towards a master's degree in psychology who
> was volunteering at the district as a mental health counselor developed
> and administered a psychological assessment for first, third, and fifth
> graders. The parents were given a consent letter stating that the purpose
> of the survey was to "establish a community baseline measure of
> children's exposure to early trauma (for example, violence)." *Id.*, 427 F.3d
> at 1200. The letter stated that the survey was "100% confidential," no
> information would be used to identify a particular child, and after the
> study was completed, surveys would be locked in storage and destroyed
> after five years. The consent letter did not inform parents that some of the
> survey questions would be about sex. *Id.*, 427 F.3d at 1201.
>
> Following the school's approval of the survey, the volunteer counselor
> administered the survey during school hours to the children, ages 7 - 10.
> <u>Fields</u>, 427 F.3d at 1201. When several parents discovered that their
> children were questioned about sex, they filed suit alleging that "had they
> known the true nature of the survey, they would not have consented to
> their children's involvement." *Id.*, 427 F.3d at 1202.
>
> The parents first argued that by administering the survey, the school
> deprived them of their free-standing fundamental right "to control the
> upbringing of their children by introducing them to matters of and
> relating to sex in accordance with their personal and religious values and
> beliefs." *Id.*, 427 F.3d at 1203. The 9th Circuit, in affirming the dismissal of
> the claims against the school responded that while parents have the right
> to choose the type of "educational forum" that their children attend under
> <u>Meyer v. Nebraska</u>, 262 U.S. 290 [sic – should be 390] (1923) and <u>Pierce v.</u>
> <u>Society of Sisters</u>, 268 U.S. 510 (1925), that "right does not extend beyond
> the threshold of the school door." <u>Fields</u>, 427 F.3d at 1207. The 9th Circuit
> then went on to find that "[a]ccordingly, *Meyer-Pierce* provides no basis
> for finding a substantive due process right that could have been violated
> by the defendants' authorization and administration of the survey." *Id.*,
> 427 F.3d at 1207. *See also Skoros v. City of New York*, -- F.3d --, 206 WL
> 240709, * 34 (2nd Cir. 2006)(Affirming summary judgment for the school
> in a parental rights claim noting "this precedent affords parents no
> 'fundamental constitutional right to dictate the curriculum at the public
> school to which they have chosen to send their children.'")
>
> The second recent case to discuss the issue of parental rights is the 3rd
> Circuit's decision in <u>C.N.</u>. In that case the school administered a survey to

7th through 12th grade students about their drug and alcohol use, sexual activity, and other controversial topics. The survey was the result of a multi-year study of local needs by a community task force known as the Community Vision Team which hoped to "understand [students'] needs, attitudes and behavior patterns in order to use the town's programs and resources more effectively." Id., 430 F.3d at 162.

To that end the Vision Team selected a survey designed by a Minneapolis based company which was then purchased and administered by the school.1 The administration sent parents two letters informing them that the survey would take place and would cover at-risk behaviors such as substance abuse, sexuality, stress, and depression. One of the letters informed parents that the survey was to be voluntary and anonymous. As in Fields, parents claimed that the survey violated their right to privacy and to control the upbringing of their children. C.N., 430 F.3d at 163-167.

Before addressing the constitutional claims, the Third Circuit first addressed whether the survey was voluntary and anonymous. The 3rd Circuit reviewed several factors in determining whether the survey was voluntary: (1) at least one teacher allegedly told students they had to take the survey, a loud speaker announcement at one school said if students did not take the survey, they would receive a cut; (2) instructions read at the high school did not say the survey was voluntary; (3) there was 100% participation in the survey; (4) absent students had to make up the survey; (5) parents received no consent form or instructions about how to exempt their children from participating in the survey; (6) the letters to parents about the survey did not contain the exact date of the survey; and (7) the survey seemed like a test—it was intended to take an entire class period, and no one could leave the classroom while it was being administered. C.N., 430 F.3d at 163-167.

Based on the foregoing factors the 3rd Circuit noted that "we conclude that the summary judgment record would also support a finding that the survey as intended by the Board and certain School Defendants acting on behalf of the Board was involuntary." C.N., 430 F.3d at 177. However, the Court also found that the "record shows that anonymity and confidentiality-- as opposed to voluntariness--were consistently stressed to parents, principals and survey administrators." Id.

Therefore for purposes of the C.N. case, the survey was involuntary but anonymous. Having made that determination, the court then turned to the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." C.N., 430 F.3d at 182.

14

> Plaintiff Parents complain that the School Defendants, by not requiring parental consent prior to the administration of the survey and failing to provide sufficient information to allow an objecting parent to avoid having their child participate, deprived them of their right to make the important decision whether to allow their child to participate in the survey. Additionally, we understand Plaintiff Parents to complain that the School Defendants' actions intruded upon their parental authority to decide when and how to introduce their children to sensitive topics such as appeared on the survey.

*Id.*, 430 F.3d at 184-185.

In resolving these claims the 3rd Circuit acknowledged that parents do have certain constitutionally guaranteed rights with respect the upbringing of their children, but:

> It does not necessarily follow, however, that the survey violated the Constitution. While the Supreme Court has extended constitutional protection to parental decisions regarding certain matters (see *Troxel*, 530 U.S. 57, 120 S.Ct. 2054 (visitation); *Pierce*, 268 U.S. 510, 45 S.Ct. 571 (decision to enroll child in private, religious school rather than public school)), our review of these cases prompts us to conclude that the decision whether to permit a middle or high school student to participate in a survey of this type is not a matter of comparable gravity.
>
> * * *
>
> School Defendants in no way indoctrinated the students in any particular outlook on these sensitive topics; at most, they may have introduced a few topics unknown to certain individuals. We thus conclude that the survey's interference with parental decision-making authority did not amount to a constitutional violation.

*Id.*, 430 F.3d at 185.

Thus under <u>Fields</u>, the parents lost their challenge to the survey because the rights of parents presented "do[ ] not extend beyond the threshold of the school door." *Id.*, 427 F.3d at 1207. Under <u>C.N.</u>, which weighed the facts, even an involuntary survey with no parental consent at all, does not violate parental rights because "the parental decisions alleged to have been usurped by the School Defendants are not of comparable gravity to those protected under existing Supreme Court precedent." *Id.*, 430 F.3d at 185 n. 26.

15

Under either of these two approaches, the claims presented in this case fail. Either because the Rhoades have no parental decisional rights "beyond the threshold of the school door" or because "the parental decisions alleged to have been usurped by the School Defendants are not of comparable gravity to those protected under existing Supreme Court precedent." Either way the School Defendants are entitled to judgment as a matter of law with respect to the interference with parental rights claims contained in Count I of the Amended Complaint.

Memorandum pp. 8-12 (footnotes omitted).

As PHMSC forthrightly admits, the Ninth Circuit's "no-rights-beyond-the-threshold-of-the-school-door" approach in *Fields*, was rejected—and rightly so in this court's view—by the Third Circuit in *C.N.*:

In reaching this conclusion [that there was no constitutional violation], we do not hold, as did the panel in *Fields v. Palmdale School District,* 427 F.3d 1197 (9th Cir. 2005), that the right of parents under the *Meyer-Pierce* rubric "does not extend beyond the threshold of the school door." *Id.* at 1207. Nor do we endorse the categorical approach to this right taken by the *Fields* court, wherein it appears that a claim grounded in *Meyer-Pierce* will now trigger only an inquiry into whether or not the parent chose to send their child to public school and if so, then the claim will fail. Instead, guided by *Gruenke* [*v. Seip*, 225 F.3d 290 (3rd Cir. 2000)], wherein this Court stressed that it is primarily the parents' right "to inculcate moral standards, religious beliefs and elements of good citizenship," 225 F.3d at 307, we have determined only that, on the facts presented, the parental decisions alleged to have been usurped by the School Defendants are not of comparable gravity to those protected under existing Supreme Court precedent.

*C.N.*, 430 F.3d at 185 n. 26. This court has found no other cases endorsing the holding in *Fields*, particularly not in this circuit. This court agrees with *C.N.* that the approach in *Fields* would gut parental rights on the issue of education of any content other than choosing a school. For that reason, and because no other court has endorsed *Fields*, it

16

does not persuade this court that its holding alone dictates a summary judgment in PHMSC's favor.

But even were the court inclined to agree with the holding in *Fields*, there is a substantial factual difference between *Fields* and the present case, also distinguishing this case from *C.N.*, and convincing this court that neither decision indicates that a summary judgment should be granted to PHMSC. The holding in *Fields* was premised on the court's belief that nothing in the relevant Supreme Court precedent indicates that parents have a right to dictate a school's curriculum: "The constitution does not vest parents with the authority to interfere with a public school's decision as to how it will provide information to its students or what information it will provide, in its classrooms or otherwise." *Fields*, 427 F.3d at 1206. *C.N.*'s holding that parental decisions "alleged to have been usurped by the School Defendants are not of comparable gravity to those protected under existing Supreme Court precedent" resulted largely from a finding, similar to that in *Fields*, that all that had occurred was the imparting of information to the students who took the survey:

> We recognize that introducing a child to sensitive topics before a parent might have done so herself can complicate and even undermine parental authority but conclude that the survey in this case did not intrude on parental decision-making authority . . . . School Defendants in no way indoctrinated the students in any particular outlook on these sensitive topics; at most, they may have introduced a few topics unknown to certain individuals.

*C.N.*, 430 F.3d at 185.

The key factual difference between *Fields* and *C.N.* on one hand and the present case on the other, is that the survey in both of those cases was completely anonymous, with no information given to the students thereafter based on their answers to the questions in the survey. *Fields*, 427 F.3d at 1200 n. 1 (consent form sent to parents stated that "survey is 100% confidential and at no time will the information gathered be used to identify your child"); *C.N.*, 430 F.3d at 174-75 ("we find . . . that the survey, as administered and as intended by the Board, was anonymous").

As the court in C.N. noted, "[t]his might be a different case if Plaintiff students actually observed administrators peeking at completed surveys or if the survey setting itself lent support to Plaintiffs' fears of compromised anonymity." *C.N.*, 430 F.3d at 177 n. 20. It is undisputed that the survey in the present case was not anonymous. In fact, it wasn't even a "survey" like those used in *C.N.* and *Fields*, designed to collect data in the aggregate. Instead, the TeenScreen exam which Chelsea took was designed to discover whether she was a suicide risk or had other significant psychological problems.[12] The court in *C.N.* cited one of its prior decisions which explains why this is a different case than an anonymous survey that gathers data in the aggregate:

> School-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution. *See Merriken v. Cressman,* 364 F.Supp. 913, 922 (E.D. Pa.1973) (questionnaire probing

---

[12] The letter/opt-out form included in the Kingsman Newsletter, Memorandum Ex. K, stated that the TeenScreen would be used to identify "potential emotional health concerns."

> family relationships by school authorities held unconstitutional). Public
> schools must not forget that " *in loco parentis*" does not mean "displace
> parents."
>
>     It is not educators, but parents who have primary rights in the
> upbringing of children. School officials have only a secondary
> responsibility and must respect these rights. State deference to parental
> control over children is underscored by the Court's admonitions that
> "[t]he child is not the mere creature of the State," *Pierce*, 268 U.S. at 535, 45
> S. Ct. 571, and that it is the parents' responsibility to inculcate "moral
> standards, religious beliefs, and elements of good citizenship." *Yoder,* 406
> U.S. at 233, 92 S.Ct. 1526.

*Gruenke v. Seip*, 225 F.3d 290, 307 (3rd Cir. 2000).

Because of the fundamental difference between the anonymous surveys at issue

in *Fields* and *C.N.* and the non-anonymous psychological screening in the present case,

*Fields* and *C.N.* do not indicate that a summary judgment should be granted to PHMSC.

2.  *Privacy interest in non-disclosure of personal information*

Although the nature and scope of the zone of privacy protected by the

Constitution are, like most of the Constitutional issues discussed herein, quite

amorphous, the Supreme Court appears to have recognized that the liberty protected by

the Fourteenth Amendment creates an "individual interest in avoiding disclosure of

personal matters." *Whalen v. Roe*,  429 U.S. 589, 599-600 (1977).  This is the interest the

Rhoades claim was violated in this case,[13] alleging that "Defendants deprived the

---

[13]  PHMSC notes that the Supreme Court has also recognized a privacy right in
independence in making certain important decisions, *Whalen*, 429 U.S. at 599-600, but
asserts that the Rhoades are making no such claim in this case. In their response the
Rhoades assert they are making such a claim, that PHMSC improperly interfered with
their family relationship and child-rearing decisions. The court believes that this claim
is subsumed within the court's discussion of the liberty interest in making decisions

(continued...)

Plaintiffs of their right to privacy by subjecting [Chelsea] to the 'TeenScreen'

examination, without the valid consent of any of the Plaintiffs, by extracting highly

personal and private matters from [Chelsea]." Amended Complaint ¶ 5.40.

Again analogizing the present case to the Third Circuit's decision in *C.N.*,

PHMSC argues that there are two defects in the Rhoades claim entitling PHMSC to

summary judgment. In *C.N.*, the court noted that the threshold inquiry for this type of

privacy claim is whether the disclosure was involuntary in nature. *C.N.*, 430 F.3d at 180.

Second, the court found that where the government's goal was to obtain valuable public

health information, the balance against disclosure of private information tipped in the

government's favor where the information was disclosed only in the aggregate with

personal information highly safeguarded. *Id.* at 180-81. Based on this, PHMSC argues

that it is entitled to summary judgment because Chelsea consented to the disclosure by

signing an assent form, and because her TeenScreen exam was confidential:

> The present case presents an even more compelling argument. The
> TeenScreen program was one component of a comprehensive health
> education curriculum for 10th graders designed in response to the high
> profile suicide of a student at Penn High School. The test was both
> voluntary and confidential as noted in the Assent form which C.R. signed.
> Under these circumstances the School Defendants are entitled to judgment
> as a matter of law with respect to the invasion of privacy claims contained
> in Count II of the Amended Complaint.

Memorandum p. 15.

_____

[13](...continued)
regarding education, *supra* part I(A)(1). *Cf. C.N.*, 430 F.3d at 182-85 (equating privacy
claim regarding important decision-making with parental liberty interest in directing
education of children.

Taking the latter half of this argument first—that the "confidential" nature of the test entitles PHMSC to summary judgment, the court fails to see how PHMSC thinks comparison to *C.N.* is apt. In *C.N.*, the survey was confidential because it was anonymous: data was collected only in the aggregate, and there was no identifying information on the survey booklet, nor information collected, which would allow any particular survey to be linked to a particular student. *Id*. at 167-68, 181. In the present case the TeenScreen was not anonymous: it was used to screen Chelsea for "emotional health concerns," and immediately after taking it she was informed she suffered from obsessive compulsive and social anxiety disorders. Under this circumstance, nothing in *C.N.* suggests that summary judgment should be granted.

That leaves only the issue of whether Chelsea consented to the disclosure, and, if so, whether that consent negates the alleged privacy violation. It is undisputed that before she took the TeenScreen exam, Chelsea signed[14] an "assent" form which, among other provisions, stated: "I have been told that participation in this program is voluntary and that I am not required to do any of these things if I do not want to. I may also refuse to answer any and all questions."Ex. 2 to Amended Complaint, ¶ (d).

In response, the Rhoades argue that Chelsea's consent was invalid as a factual matter, because she was told to sign the form without being told its nature or purpose,

---

[14] PHMSC states that it attached to its reply memorandum, as Exhibit A, a copy of the assent form "which clearly bears Chelsea's signature." Rely p. 4. This is not correct, the image filed in the court's CM/ECF system as Ex. A is a blank copy of the form. Nevertheless, although the copy of the form attached to the Rhoades' amended complaint is also blank, they plead in ¶ 3.13 that Chelsea signed it.

and under circumstances in which she did not have time to review it: they deny that her consent was "knowing, effective, or valid." First Response at 10.[15] In addition, the Rhoades argue that regardless of whether her consent was knowing, it was ineffective and void as a matter of law, because of two Indiana statutes[16] which required any such consent to be made by her parents, Ind. Code § 31-32-5-1, and § 20-10-.1-4-15(b).[17]

As to the Rhoades' contention that Chelsea's consent was not knowing and voluntary, PHMSC argues that there are facts that suggest otherwise, such as Chelsea's admission during her deposition that she recalls reading part of it and checking the box stating that she understood it.[18] Essentially, however, PHMSC appears to recognize that there is a factual dispute whether Chelsea knowingly executed the form, and argues

---

[15] All citations to "First Response" are to DE # 31.

[16] The court notes that neither party has provided any authority to the court indicating whether the validity of consent to disclosure of private information, for federal constitutional purposes, is a matter defined by state law. This would seem unlikely. *Cf. United States v. Wilderness*, 160 F.3d 1173, 1175 (7th Cir. 1998) ("voluntariness of a confession depends on public officials' compliance with constitutional norms, not on any rule of state law.") Because the parties have not addressed this issue, and instead have argued that the validity of Chelsea's consent depends on state law, the court rules on their arguments, and not on some argument that the court might make for them.

[17] The Rhoades actually cite and quote the section now in effect, Ind. Code § 20-30-5-17(b), noting that it is a nearly identical, re-numbered enactment of Ind. Code § 20-10.1-4-15(b). For consistency, the court cites and quotes only the latter statutory section, which was in effect on the date of the incident. The differences between it and § 20-30-5-17(b) are not substantive, involving mainly the elimination of parentheses and the word "guardian."

[18] As noted *supra* p. 7 n. 8, PHMSC has not provided the deposition pages necessary to support this argument.

22

that it doesn't matter, citing both case law and the Restatement for the proposition that

a contract is binding whether or not a party has read it: "Generally, one who assents to a

writing is presumed to know its contents and cannot escape being bound by its terms

merely by contending that he did not read them." Reply p. 5[19] (quoting RESTATEMENT OF

CONTRACTS 2d § 157). However, Indiana has always recognized that minors can void

their contracts at any time. *Mullen v. Tucker*, 510 N.E.2d 711, 714 (Ind. Ct. App. 1987).

This is, at bottom, what Chelsea is doing by contending that she did not understand the

agreement and knowingly enter into it, making PHMSC's reliance on general contract

principles unavailing.

Even if that were not the case, however, there is the Rhoades' contention that

regardless whether Chelsea knowingly signed the consent form, Indiana statutes

preclude her from being able to give her consent to the TeenScreen exam in the first

place. The first statute identified by the Rhoades is Indiana's "meaningful consultation"

statute, and provides:

> Any rights guaranteed to a child under the Constitution of the United
> States, the Constitution of the State of Indiana, or any other law may be
> waived only:
>> (1) by counsel retained or appointed to represent the child if
>> the child knowingly and voluntarily joins with the waiver;
>> (2) by the child's custodial parent, guardian, custodian, or
>> guardian ad litem if:
>>> (A) that person knowingly and voluntarily
>>> waives the right;
>>> (B) that person has no interest adverse to the
>>> child;

---

[19] All citations to "Reply" are to DE # 60.

(C) meaningful consultation has occurred
between that person and the child; and
(D) the child knowingly and voluntarily joins
with the waiver; or
(3) by the child, without the presence of a custodial parent,
guardian, or guardian ad litem, if:
(A) the child knowingly and voluntarily
consents to the waiver; and
(B) the child has been emancipated under IC
31-34-20-6 or IC 31-37-19-27, by virtue of
having married, or in accordance with the
laws of another state or jurisdiction.

Ind. Code § 31-32-5-1. As PHMSC argues in passing, Reply p. 11 n. 4, this statute is

inapplicable here.

This statute appears in the Juvenile Court Procedure article of the Family and

Juvenile Law title of the Indiana Code. Although the court has not found any authority

supporting the proposition, it is unlikely that statute in the "Juvenile Court Procedure"

article has effect outside of that arena. This conclusion results from common sense, and

reading Article 32 as a whole. For example, the first Chapter in the Article contains

provisions stating when the Indiana Rules of Criminal and Trail Procedure apply

instead of the Juvenile Rules. *See* Ind. Code  § 31-32-1-1 through § 31-32-1-3. The statute

provides a rule governing juvenile court proceedings which the court will not apply

here. See also *G.J. v. State*, 716 N.E.2d 475, 477 (Ind. Ct. App. 1999) (meaningful

consultation statute applies to custodial interrogations).

The other statute the Rhoades cite is different, however. It provides in pertinent

part:

24

A student shall *not be required* to participate in a personal analysis, an evaluation, or a survey that is not directly related to academic instruction and that reveals or attempts to affect the student's attitudes, habits, traits, opinions, beliefs, or feelings concerning:

      (1) political affiliations;

      (2) religious beliefs or practices;

      (3) mental or psychological conditions that may embarrass the student or the student's family;

      (4) sexual behavior or attitudes;

      (5) illegal, antisocial, self-incriminating, or demeaning behavior;

      (6) critical appraisals of other individuals with whom the student has a close family relationship;

      (7) legally recognized privileged or confidential relationships, including a relationship with a lawyer, minister, or physician; or

      (8) income (except as required by law to determine eligibility for participation in a program or for receiving financial assistance under a program);

without the prior consent of the student (if the student is an adult or emancipated minor) or the prior written consent of the student's parent or guardian (if the student is an unemancipated minor).

Ind. Code § 20-10-.1-4-15(b) (2004) (emphasis added). Thus, the Rhoades argue that

Chelsea's consent was invalid because the prior written consent of her parents was not

obtained.

      PHMSC argues that this statute, like the first, is wholly inapplicable because

Chelsea's participation in the survey was *not required*: as the assent form she signed

stated, her participation was voluntary, and she could refuse to answer any question

she wished. The Rhoades contend that this argument's logic is circular, and negates the

statute of any meaning: the statute doesn't apply if participation was not required, and

we know participation was not required because the participant, who couldn't consent

if participation was required, signed a consent stating that they were participating voluntarily. Stating the circularity another way, even in the face of the statute Chelsea had the ability to consent making her parents' consent unnecessary, because her consent shows the TeenScreen was voluntary. Thus, as the Rhoades see it, the intent behind the statute—to require parental consent for intrusive surveys—is frustrated if schools can avoid obtaining that consent simply by calling a survey voluntary, and proving it was voluntary by having the minor students sign a consent form. Therefore, the Rhoades argue that the statute should be interpreted so as to always require parental consent for intrusive surveys.

Although the Rhoades' argument has some merit, the question of statutory interpretation doesn't have to be answered at this juncture, because no matter which interpretation of the statute is correct, there is a question of fact as to whether the survey was required. PHMSC argues that the facts show the test was in fact voluntary, both because of the assent form that was signed, and because of 740 students eligible to take the TeenScreen, only 623 did. The other 117 either had their parents return the opt-out form, were absent from school that day, or refused to sign the assent form.[20]

In the court's view, while this is certainly evidence in PHMSC's favor, it is not enough to negate the existence of a question of fact. There are also facts in the record

---

[20] Risner Aff. ¶ 18. Other than stating that 23 students' parents' opt-out forms were returned, the affidavit doesn't break the numbers down further. Thus, it is unknown whether any students themselves declined to take the test, or whether the other 94 all missed the TeenScreen due to absence.

that do suggest that Chelsea's (and any student's) signing of the "assent" form and taking of the test was under circumstances where the consent was under duress and the test *de facto* required.

First, as noted *supra* p. 26, n. 20, the evidence provided by PHMSC doesn't establish the number—if any—of students who refused to sign the consent form and were excused from the TeenScreen. Second, in both her affidavit and in her deposition, Chelsea explained that she had no prior knowledge of the purpose of the test, that she thought that she had to sign the form and take the test, that she was told that she needed to hurry when reading and signing the form. The court notes that, consistent with Chelsea's claim of being hurried, several intra-school memoranda attached to the assistant principal Risner's affidavit in support of PHMSC's motion for summary judgment emphasize that the screening was being done on a very tight time schedule. *See e.g.*, Risner Aff., Ex. M, p. 2 (November 5, 2004 memo to home room teachers stating "[s]tudents <u>MUST ARRIVE ON TIME</u> as the schedule is very tight.")

The consent form itself—at least the copies of it provided for the summary judgment record—contains a surprising item: paragraph (k) states: "If I have any further questions about this project, I may call *NAME, NUMBER OF PROJECT COORDINATOR*." *See, e.g.*, Reply, Ex. A. Obviously, someone was supposed to have changed the italicized portion to the actual name and telephone number of a person. Under the circumstances, of course, the information would have been useless: there was no time before taking the TeenScreen to place a call, and it appears that the students

27

were not given a copy of the form to keep afterwards. While the court doesn't necessarily believe that the omission of this information contact information by itself voids the students' consent, it makes it difficult to see how any of the students could have actually "agreed with" the information on the form, as the form indicated they were doing by signing it. Therefore, it is a further indication that the students simply signed the form because they were told to do so, and did not understand that they had a choice.

Because of these circumstances, a question of fact remains as to whether the TeenScreen was effectively required for the students whose parents had not returned the opt-out form. With that question of fact, even if PHMSC is correct that parental consent is not required for a voluntary test, the applicability of the statute has not been ruled out by PHMSC's argument, and so PHMSC has not shown it is entitled to summary judgment on that basis.

*B. Claims Based on Indiana State Law*

*1. Violation of Indiana Code § 20-10.1-4-15*

This is the statutory section discussed *supra* pp. 24-28 requiring parental consent before a student may be required to take a survey revealing personal beliefs and opinions. PHMSC argues that the Rhoades may not assert a claim based on a violation of this statute because, first, the statute does not create a private cause of action, and second, because the statute is inapplicable because the TeenScreen survey was voluntary, not required.

28

The second argument is unavailing because, as explained *supra* pp. 26-28, there is a question of fact as to whether Chelsea's taking of the TeenScreen was truly voluntary. As to the first "argument," the court places that term in quotation marks because the entire argument consists of one sentence in PHMSC's memorandum: "First, the statute has since been repealed and does not appear to have ever been intended to create a private cause of action." Memorandum p. 15. One unsupported sentence isn't an argument, and if the Rhoades had ignored it in their response, the court would have done so as well. Instead, the Rhoades gave it cursory attention in a footnote, giving PHMSC the opportunity to amplify its argument in its reply memorandum. The court will, therefore, address the parties' positions.

According to the Rhoades, under Indiana law a private cause of action will be inferred when a statute creates a duty for an individual's benefit, *Blanck v. Indiana Dep't of Corrections*, 829 N.E.2d 505, 509 (Ind. 2005), and only when the statute is clearly intended to benefit only the public at large does it not allow for a private action. *Whinery v. Roberson*, 819 N.E.2d 465, 475 (Ind. Ct. App. 2004). In its reply, PHMSC argues that the Rhoades have taken a portion of *Blanck* out of context, that context being a holding that the statute at issue did *not* create a private cause of action. Moreover, as the Indiana Supreme Court observed in *Blanck*, the issue isn't as simple as just saying that a private cause exists if the statute created a right for an individual's benefit: finding such a right is only the starting point in a complex statutory analysis.

Instead of completing its argument by engaging in that complex statutory analysis, PHMSC—the party here with the duty to show the court why it is entitled to summary judgment—notes only that the Indiana legislature enacted § 20-10.1-4-15 with knowledge that the United States Supreme Court had already held, in *Gonzaga v. Darrell*, 536 U.S. 273 (2002), that the federal statute on which the state statute is based did not create a private cause of action. Therefore, PHMSC argues that the Indiana legislature's failure to expressly state that a private cause of action is created signals its intent to the contrary.

The bottom line is that the parties have given the court little analysis of this question of statutory interpretation. Most surprisingly, neither party has cited subsection (d) of the statute, which states: "The governing body [i.e., the school corporation] shall enforce this section." Ind. Code § 20-10.1-4-15(d) (2004). The question of whether a statute creates a private cause of action is "ultimately one of legislative intent," *Blanck*, 829 N.E.2d at 510, and subsection (d) is the clearest indication available of the Indiana legislature's intent in § 20-10.1-4-15. When a statute "includes a specific enforcement provision, an additional private cause of action based upon the statute cannot be judicially inferred." *Coons v. Kaiser*, 567 N.E.2d 851, 852 (Ind. Ct. App. 1991). As a result, PHMSC is granted summary judgment on the Rhoades' claim for damages based on a violation of Ind. Code § 20-10.1-4-15(d).[21]

---

[21] This conclusion is consistent with the Court's decision in the *Gonzaga* case. In *Gonzaga*, the Court was asked to decide whether an individual could sue his university

(continued...)

*2. Negligent Breach of Duty*

The Rhoades allege in Count IV of their complaint that PHMSC had a duty not to inform Chelsea of any diagnosis or the results of any analysis without first obtaining parental consent, and negligently breached that duty. PHMSC gives two reasons why it should be granted summary judgment on this claim. Because PHMSC's argument and analysis consists of one short paragraph, instead of paraphrasing it the court will quote it:

> First, there is no legal basis for the existence of such a duty and such a duty simply does not exist. Second, and more importantly, the School never disclosed any information to C.R.. Indeed the Amended Complaint is devoid of a single allegation that any Penn High School employee was involved in the administration of the test or the alleged misinterpretation of the test results. *See e.g.* Am. Compl., ¶ 3.18 - 3.21 noting "[C.R.] was approached by an employee or agent of Defendant Madison Center, Inc." In reality the undisputed facts are that the School had no involvement with the administration of the test or the discussion of the test answers at all.

Memorandum p. 17 (citation to affidavit omitted).

The Rhoades respond that in *Mangold v. Indiana Dep't of Natural Resources*, 756 N.E.2d 970 (Ind. 2001), the Indiana Supreme Court held that public school authorities

---

[21](...continued)
for damages under the Federal Educational Right to Privacy Act ("FERPA"), 20 U.S.C. § 1232g, for disclosing his private information in violation of that Act. In a nutshell, the Court answered "no," finding that because the FERPA was an exercise of Congress' spending power, the conditions imposed therein had an "aggregate" focus, designed to ensure system-wide performance by the institutions to which federal funds would flow, not grant enforceable rights to individuals. *Gonzaga*, 536 U.S. at 290-91. The Court found this conclusion "buttressed" by the "mechanism that Congress chose" for enforcement, specifically empowering the Secretary of Education to "'*deal with violations*.'" *Id.* at 289 (quoting 20 U.S.C. 1232g (emphasis added in *Gonzaga*)).

have a duty to exercise reasonable care and supervision for the safety of the students under their control, and that whether that duty was breached under the facts of virtually every case is a question for the trier of fact. The Court noted that it had "essentially . . . made a policy decision" to impose such a duty to entitle students to protection:

> An approach that focuses on rearticulating that duty based upon a given set of facts is misplaced in our view because to do so presupposes that an issue which is thought to be settled must be revisited each time a party frames the duty issue a little differently. Rather, because a school's duty to its students already has been established, the focus shifts to whether a given set of facts represents a breach of that duty.

*Mangold*, 756 N.E.2d at 974-75.

Despite the title on section V of its Reply Memorandum ("The School did not owe the Plaintiffs a duty of care," Reply p. 13), PHMSC completely—and sensibly in light of *Mangold*—abandons that argument and asserts only its argument that the undisputed facts show that it did not breach that duty, because it neither administered the test, nor controlled how the results were disclosed to the students. Those functions were performed by the other defendant in this case, the Madison Center, an entity which is unconnected to PHMSC.

In the court's view, an appropriate analogy to this argument would be one where PHMSC invited NAMBLA—the North American Man/Boy Love Association, see *United States v. Mayer*, 490 F.3d 1129 (9th Cir. 2007), for a description of this organization—into the school to hold an informational session, resulting in a student

being sexually molested, and then PHMSC argued that it had breached no duty because NAMBLA, not a school official, committed the act of molestation. The court does not use this analogy to be facetious. Instead, it is to make the point that PHMSC's argument, at bottom, is that it has no responsibility for what occurs within the confines of its school buildings when an outside agency is involved, even if that agency is present only because PHMSC has invited it onto the premises.

This is essentially the Rhoades' response, arguing that PHMSC acted jointly or in concert with the Madison Center in administering the TeenScreen to Chelsea. As the Rhoades point out, PHMSC goes so far as to state in the opening paragraph of, and throughout its memorandum in support of summary judgment that the "TeenScreen Program was one component of a comprehensive health education curriculum for 10th graders designed in response to the high profile suicide of a student at Penn High School." Memorandum pp. 1, 15. In addition, the Rhoades point to evidence in the record showing that school administrators were not "passive bystanders," First Response p. 18, in the decision to implement, and the administration of, the TeenScreen survey. For example, at a February 28, 2005, school board meeting, the current superintendent of schools stated that the "former superintendent of the Penn-Harris-Madison School Corporation was a member of the task force involved in the development of a screening program for St. Joseph County and committed Penn High School to participate in the screening program." First Response p. 18, ex. A, p. 4. Furthermore, as the Rhoades summarize:

Defendant Risner, who was the Associate Principal at Penn High School in December 2004, admitted at his deposition that third parties could not and cannot cause testing to occur at the high school without the consent and approval of the school (Risner Dep. at 15) and that he could exclude Madison Center representatives from the school (Risner Dep. at 46). Risner also testified that he was aware that the school was sending out passive consent permission slips to parents, that Defendant Steven Hope [the assistant principal] had requested permission to use these passive consent forms, and that Risner had given Hope that permission (Risner Dep. at 18, 20).

Steve Bright of Madison Center testified at his deposition that Defendant Marni Cronk of Penn High School had taken responsibility for obtaining the consents from parents in connection with the administration of TeenScreen and that the school had agreed to the "passive" consent forms that were used (Bright Dep. at 19-20). Bright also discussed the consent issue with Defendant Hope (Bright Dep. at 52). Ultimately, it was the school that determined how consent would be sought and obtained from parents (Bright Dep. at 99, 103).

Defendant Vicki Marshall, who was a guidance counselor at Penn High School, testified at her deposition that she and Defendant Cronk organized the schedule for the TeenScreen administration (Marshall Dep. at 9). Home room teachers were instructed by school administrators to send students down to the conference room for TeenScreen administration (Marshall Dep. at 19). Also, Madison Center employees used school personnel to hold students after the administration of TeenScreen in order to "debrief" the students about the results of the test (Marshall Dep. at 23). Marshall had no doubt that TeenScreen was administered with the approval of Penn High School administration (Marshall Dep. at 24).

Second Response pp. 3-4.[22]

In the face of this evidence, PHMSC's argument in reply is again its assertion that because a third party actually administered the test, it bears no responsibility:

[T]here is no evidence that it was Penn-Harris-Madison School Corporation *alone* which determined that Teen Screen should be employed in its School. To the contrary, this was a community response to a Penn

---

[22] All citations to "Second Response" are to DE # 50.

High School student's suicide, spearheaded by the Human Services
Council and Connect, Inc. ("HSCC.")

.   .   .

[T]here is no evidence that School had any control (or knowledge) of
the manner in which the assent[23] of students was obtained, of the
discussion by Madison Center with Chelsea, or her results. Absent such
control of any kind, School cannot he held liable for these actions.

Reply pp. 2, 4 (emphasis added).

In the court's opinion PHMSC simply does not appreciate that all this evidence

does is create an issue of fact as to whether it breached its duty to exercise reasonable

care and supervision of its students. The facts in *Mangold* are instructive.

In *Mangold* an employee of the Indiana Department of Natural Resources

("IDNR") came to the school to conduct a "hunter education class" as part of the

school's science curriculum concerning firearm safety. *Mangold*, 756 N.E.2d at 973.

Later, a student who had attended the class was injured at home when he attempted to

dismantle a shotgun shell as he had observed in class. *Id.* The Indiana Supreme Court

found that a factual question existed as to whether the school had breached its duty of

care, *Id.* at 975, without any indication that it mattered that a third party, an IDNR

employee, had been the one who presented the information that (allegedly) caused the

harm. The facts in Mangold were even more attenuated than in the present case,

because the incident which caused the injury occurred after school hours, at the

student's home.

_____

[23] The court understands this to be a reference to the assent form Chelsea signed,
not the passive consent form mailed to parents.

35

Under all of the circumstances in the present case, there is a material issue of fact as to whether PHMSC breached its duty of care, and it will not be granted a summary judgment on this issue.

*3. Invasion of Privacy*

> The tort of invasion of privacy includes four distinct injuries: (1) intrusion upon seclusion, (2) appropriation of likeness, (3) public disclosure of private facts, and (4) false-light publicity. *Munsell v. Hambright,* 776 N.E.2d 1272, 1282 (Ind. Ct. App. 2002). To establish a claim for invasion of privacy by intrusion, "a plaintiff must demonstrate that there was an 'intrusion upon his or her physical solitude or seclusion, as by invading his or her home or other quarters.' " *Branham v. Celadon Trucking Servs., Inc.,* 744 N.E.2d 514, 524 (Ind. Ct. App. 2001) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 117 at 854 (5th ed.1984)). Indiana courts "have narrowly construed the tort of invasion of privacy by intrusion." *Creel v. I.C.E. & Assoc., Inc.,* 771 N.E.2d 1276, 1280 (Ind. Ct. App.2002). While the tort "arguably embraces intrusion into emotional solace," *Munsell,* 776 N.E.2d at 1283, "[t]here have been no cases in Indiana in which a claim of intrusion was proven without physical contact or invasion of the plaintiff's physical space such as the plaintiff's home," *Creel,* 771 N.E.2d at 1280. In *Cullison v. Medley,* our Supreme Court held that the tort of invasion of privacy by intrusion "consists of an intrusion upon the plaintiff's *physical* solitude or seclusion as by invading his home or conducting an illegal search." 570 N.E.2d 27, 31 (Ind. 1991) (emphasis added).

*Newman v. Jewish Community Center Assn. of Indianapolis*, 875 N.E. 2d 729, 736-37 (Ind. Ct. App. 2007) (footnote omitted). As PHMSC observes, the Rhoades' are alleging a claim based upon an intrusion into their familial seclusion. PHMSC argues that it is entitled to summary judgment because the undisputed facts show that the Rhoades suffered no intrusion into their *physical* solitude or seclusion.

36

The Rhoades' argument in response is that PHMSC is "unduly restrict[ing] the scope of the tort," First Response p. 20, and that federal courts sitting in Indiana have recognized, relying on *Prosser and Keeton on Torts*, that highly personal questions and demands made by a person in authority can invade a person's psychological solitude and therefore be an invasion of privacy. *See Van Jelgerhuis v. Mercury Finance Co.*, 940 F. Supp. 1344, 1368 (S.D. Ind. 1996) (and cases cited therein).

The problem with the Rhoades' argument is that, in the twelve years since *Van Jelgerhuis*, no Indiana state court appears to have cited it as support for finding a cause of action based on an intrusion into psychological seclusion, and instead the Indiana courts have continued to insist, as recognized only a year ago in *Newman*, that there be some physical intrusion upon a plaintiff's solitude. Thus, the landscape of state law appears different than it did when *Van Jelgerhuis* was decided, or even longer ago when the undersigned decided *Garus v. Rose Acre Farms, Inc.*, 839 F. Supp. 563 (N.D. Ind. 1993). It is not the prerogative of federal courts to expand state tort law beyond the limits that state courts have indicated to be desirable. *See King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997) (and cases cited therein). Because there is no physical invasion of privacy in this case, and because of the Indiana state courts' lengthy practice of requiring that element to exist, this court will not expand the tort of invasion of privacy beyond that limitation. PHMSC will be granted summary judgment on the Rhoades' state-law claim for invasion of privacy.

*4. Intentional Infliction of Emotional Distress*

Indiana recognizes that the basis for this tort is an intent to cause emotional harm to another, and that the proof requirements are "rigorous." *Branham v. Celadon Trucking Services, Inc.*, 744 N.E.2d 514, 523 (Ind. Ct. App. 2001). The elements a plaintiff must prove to establish the tort are: the defendant 1) engaged in extreme and outrageous conduct that 2) intentionally or recklessly 3) caused 4) severe emotional distress to another. *Id.* The Rhoades have alleged that the "conduct of relating to Plaintiff [Chelsea] a diagnosis that she suffered from obsessive compulsive disorder and social anxiety disorder was extreme and outrageous conduct and utterly intolerable in a civilized community." Amended Complaint ¶ 9.2. PHMSC argues that it is entitled to summary judgment on this claim because, first, PHMSC was not the party who related a diagnosis to Chelsea, and second, it can be determined as a matter of law that none of PHMSC's conduct was "extreme and outrageous."

In their response, the Rhoades ignore the first argument, and instead respond only that PHMSC's "primary" argument is that no extreme and outrageous conduct was involved. The Rhoades then discuss *Bradley v. Hall*, 720 N.E.2d 727 (Ind. Ct. App. 1999), a case in which the court refused to rule as a matter of law that a workplace supervisor's discussion of highly personal matters such as medical condition and sexual status with the plaintiff was not extreme and outrageous. The Rhoades argue that "[a]ny civilized person would be shocked at the idea of informing a minor that she has significant psychological problems without first consulting the child's parents[.]" First Response p. 21.

38

In its reply, PHMSC concedes this point, stating that "[w]hile one can question whether such information would indeed shock any civilized person, the fact remains that School had nothing to do with advising Chelsea that she had any significant psychological problem." Reply p. 14. PHMSC points out that the Rhoades' amended complaint alleges that an "agent and employee of Defendant Madison Center, Inc." communicated the diagnosis to Chelsea. Amended Complaint ¶¶ 3.18-3.20.

Although the court has determined above that PHMSC has potential liability for the administration of a test or survey (the TeenScreen) that in and of itself may have violated substantive due process rights and rights under state law, the court is not sure that necessarily answers the question whether PHMSC can be held liable for a tort alleged to have been committed by an employee of a third party. Neither PHMSC nor the Rhoades have given the court any guidance in answering this question.[24] Because PHMSC has stated that the TeenScreen was part of its health education curriculum, it is perhaps appropriate to consider defendant Madison Center an independent contractor employed by PHMSC to provide that portion of the curriculum.

Generally speaking, employers of independent contractors are not liable for torts committed by the independent contractor, but, as one Indiana court has sagely observed, the general rule "is often recited primarily as a preamble to the catalog of its

---

[24] PHMSC does argue that it can only be held liable under theories of agency or joint venture which it believes are inapplicable in this case. As explained in the accompanying text, however, the court believes that PHMSC has potential liability even if the Madison Center is viewed as an independent contractor.

exceptions." *Cummings v. Hoosier Marine Properties, Inc.*, 173 Ind. App. 372, 363 N.E.2d 1266, 1274 (1977). The exceptions are extensive, complex and fact-intensive. Without any argument from the parties in the present case, the court is unwilling to make a determination whether or not PHMSC is potentially liable. Because PHMSC has the burden of showing that it is entitled to summary judgment, this means that its request for summary judgment will be denied at this point. The court cautions, however, that this is not a guaranty that this claim will ever make it to a jury.

*5. Right to Privacy Under Article I, Section 1 of the Indiana Constitution*

Article I, Section 1 of the Indiana Constitution provides, as pertinent here, that all people are endowed by their Creator with inalienable rights, and that "among these are life, liberty, and the pursuit of happiness." In *Clinic for Women, Inc. v. Brizzi*, 814 N.E.2d 1042 (Ind. Ct. App. 2004), the Court of Appeals held that this section "protects and is animated by privacy as a core constitutional value," *Id*. at 1044, and that governmental action is invalid if it "materially burdens" that core value. *Id*. at 1051. Relying on *Clinic for Women*, PHMSC argues that it is entitled to summary judgment on the Rhoades' claim for breach of privacy under the Indiana Constitution because it did not "materially burden" their privacy right given that Chelsea consented to take the TeenScreen and was free to refuse to answer any questions on it, and her parents were given the opportunity to "opt out" of having her take the survey.

The Rhoades have responded to this argument on its terms, but the court believes that *Clinic for Women* is completely inapposite to the facts of the present case.

40

First, the holding is not even Indiana precedent, as it was vacated by the Indiana Supreme Court along with this comment: "We find it unnecessary to determine whether there is any right to privacy or abortion provided or protected by Indiana's Constitution[.]" *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 978 (Ind. 2005).[25]

Even were that not the case, in *Clinic for Women* the plaintiff was seeking injunctive relief: to have an Indiana statute requiring counseling and a waiting period before obtaining an abortion, declared invalid because unconstitutional under the privacy right alleged to exist under Article I, section 1 of the state constitution. *Clinic for Women, Inc. v. Brizzi*, 814 N.E.2d at 1046. In the present case, the Rhoades are suing for damages for breach of the privacy right alleged to exist under the Indiana Constitution.

In *Cantrell v Morris*, 849 N.E. 2d 488 (Ind. 2006), the Indiana Supreme Court considered the question whether Article I, section 9 of the state constitution, the free speech provision, itself provides a damage remedy for a public employee terminated in violation thereof because of his/her political affiliation. *Id.* at 498-506. *Cantrell* is lengthy and could be discussed at great length here, but instead, in this already-lengthy opinion, the court will simply state the key.

In *Cantrell* the Indiana Supreme Court explained that a remedy for damages has been judicially-created for violations of the United States Constitution because, in its

---

[25] However, the Indiana Supreme Court did continue its analysis by assuming that, even if such a right existed, as applied in the circumstances of the case the statute was not invalid because it did not place a material burden on any right of privacy that might exist. *Id.* at 982-88.

41

absence, there would be no way to vindicate the constitutional right. State law is different because there are other remedies, and so the Court stated: "If state tort law is generally available even if restricted by the ITCA [Indiana Tort Claims Act], it is unnecessary to find a state constitutional tort." *Id*. at 506.

In the present case, the full body of state tort law is available to the Rhoades, and they in fact did alleged a state tort invasion of privacy claim. It is, therefore, unnecessary to find that an action for damages exists directly under Article I, section 1 of the Indiana Constitution, and PHMSC will be granted summary judgment on that claim.

*II. Liability of Individual Defendants*

*A. Federal Constitutional Claims*

The individual defendants argue that there is no evidence that they personally participated in the wrongs alleged, a prerequisite to liability, see *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003), and that even if they did, they are entitled to qualified immunity.

"Governmental actors performing discretionary functions are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) (citing *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed. 2d 396 (1982))). Qualified immunity does not exist if the facts, taken in the

42

light most favorable to the plaintiff, show that defendants' conduct violated a constitutional right, and that constitutional right was clearly established at the time of the alleged violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L.Ed. 2d 272 (2001). A plaintiff shows that a constitutional right is clearly established by "showing that there is 'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008) (quoting *Smith v. City of Chicago,* 242 F.3d 737, 742 (7th Cir.2001); *Saffell v. Crews,* 183 F.3d 655, 658 (7th Cir.1999)).

In this opinion, *supra* pp. 12-28, the court has found that, when the facts are viewed most favorably to the Rhoades, the administration of the TeenScreen violated their rights to privacy under the Fourteenth Amendment, the first showing necessary to defeat qualified immunity. As to the second aspect, whether the right violated was clearly established, the Rhoades argue there is no question of whether that is the case, the Supreme Court having recognized in *Troxel* that the fundamental right of parents to make decisions regarding the care, custody, control and upbringing of their children has been established for over 100 years. *Troxel*, 530 U.S. 57 at 65.

If only it were that simple. Although the *existence* of parents' fundamental rights in regard to their children have long been recognized, the substance and contours of those rights are matters of ongoing evolution and are extremely vague and amorphous. As the Rhoades have noted, in determining whether a defendant is entitled to qualified

immunity, "[the question is whether a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were unlawful." *Nabozny v. Podlesny,* 92 F.3d 446, 456 (7th Cir. 1996). It took this court nearly twenty pages, *supra* pp. 10-28, to analyze and determine whether the facts of this case, viewed in the light most favorable to the Rhoades, establish the violation of a Constitutional right. That itself answers the question whether a reasonable state actor would have understood that his or her actions were unlawful, and that answer is "no." The individual defendants are entitled to qualified immunity, and a summary judgment, on the Rhoades federal claims.

*B. State law claims*

In their motion for summary judgment, the individual defendants argue that a state statute requires that their actions be criminal, clearly outside the scope of their employment, malicious, willful and wanton, or calculated to benefit them personally before they may be held liable, Ind. Code § 34-13-3-5(b), and that the Rhoades have neither alleged, nor have any evidence of, conduct fitting any of those descriptions. The Rhoades have conceded that PHMSC is correct by failing to make any argument whatsoever in response. The individual defendants will be granted a summary judgment on the state-law claims against them.

44

**CONCLUSION**

For the foregoing reasons, PHMSC's motion for summary judgment (DE # 27) is

**GRANTED IN PART and DENIED IN PART**. The Rhoades' motion to set trial date

(DE # 68) is **GRANTED**. Magistrate Judge Nuechterlein is requested to conduct a

pretrial conference at his earliest convenience, to establish a date for the trial of this

case.


**SO ORDERED.**


August 5, 2008


                              s/James T. Moody
                              JUDGE JAMES T. MOODY
                              UNITED STATES DISTRICT COURT